UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA            )
                                    )
                    Plaintiff,  )
                                    )
         v.                         )   CRIMINAL ACTION
                                    )   NO. 09-10376-WGY
MICHAEL HART                        )
                                    )
                    Defendant.  )
                                    )
```

MEMORANDUM

YOUNG, D.J.                                       July 30, 2010

The defendant Michael Hart has been charged with one count

of felony possession of a firearm and ammunition in violation of

Title 18 of the United States Code, section 922(g)(1).   Hart

moved to suppress the gun and ammunition recovered by the police.

The Court heard testimony on the motion to suppress on May 25 and

June 4, 2010, from State Troopers Marc Lavoie and Jimi Grasso, as

well as from Tiffany Gomes, a witness called by the defense.

This Court denied the motion to suppress on June 15, 2010, for

the reasons set forth herein.

**I.   FACTS**

On July 7, 2009, five Massachusetts State Police officers

assigned to the Southeastern Massachusetts Gang Task Force

responded to the area of 102 Griffin Court in New Bedford,

Massachusetts to investigate the whereabouts of three males who had escaped from Massachusetts Department of Youth Services ("DYS") detention center.

Trooper Lavoie testified that the troopers were provided with documents containing identifying information for the DYS escapees. The identifying information included photos and physical descriptions, such as height, weight, and race. Trooper Grasso testified that he was only provided racial information. Approaching the rear of the Griffin Court address, Troopers Lavoie and Grasso observed Hart speaking with a woman at the rear of the building. Both officers testified that from a distance they believed that Hart may have been one of the fugitives. This, however, strains credulity because standing at six feet, three inches tall, Hart is at least six inches taller than any of the DYS escapees; Hart is also more than ten years older and weighed over a hundred pounds more than each of the fugitives. Physically, the only characteristic that Hart shared with one of the fugitives was his race.

Nonetheless, Hart caught the officers' attention because he was standing outside 102 Griffin Court. The troopers were not wearing uniforms, but wore jackets indicating that they were members of the task force. Hart appeared startled to see the police officers. The woman yelled into the house, alerting the occupants that the police were coming. Thereupon, Hart proceeded

2

to walk at a brisk pace towards a grey vehicle parked in a nearby alley.

While the troopers' testimony differed as to the speed at which Hart proceeded to the car and his path, both troopers clearly observed that Hart was bent over slightly and clutching at his waist area. Based upon their significant training and experience, the troopers believed that Hart's posture indicated a concealed weapon.

Trooper Grasso indicated to Trooper Lavoie that he should follow Hart. Approaching Hart, Trooper Lavoie observed some unusual conduct. As Hart entered the passenger side of the car, Hart turned his body in such a manner as to shield his movement from the officer's view. Even so, Trooper Lavoie observed Hart reach under his shirt and remove an item from his waistband. After Hart sat down, Trooper Lavoie saw Hart reach down in between the seat and the door.

Upon reaching the driver's side of the vehicle, Trooper Lavoie told Gomes, the driver, to put the car in park and to turn off the engine. Gomes had been waiting in the car for Hart to return from a brief visit with friends at 102 Griffin Court. She was listening to music and did not see Hart leave 102 Griffin Court, the approach of the troopers, or Hart's path from 102 Griffin Court to the car. Gomes only became aware of the police officers when Trooper Lavoie asked her to put her car in park and

3

turn off the engine. Gomes testified that Hart did not appear nervous to her and that he reached for his identification with his right hand after Trooper Lavoie requested their identification.

When Trooper Lavoie looked at Hart's identification, he recognized Hart as a member of the Montes Park street gang. Trooper Lavoie observed that Hart appeared nervous, rocking back and forth in his seat and avoiding eye contact. In addition, Trooper Lavoie found it unusual that Hart placed his hands on the dashboard - without Trooper Lavoie requesting such an action - to show that he had nothing in his hands.

Trooper Lavoie caught Trooper Grasso's attention and Trooper Grasso approached the vehicle. Trooper Lavoie informed Trooper Grasso of his suspicion of a weapon and that Hart was a member of the Montes Park street gang. The troopers moved to the passenger side of the vehicle and ordered Hart to get out of the car. The troopers again observed that Hart appeared very nervous. They asked if he had anything on him, and Hart responded, "Who me? I don't think so." After answering, Hart looked at the area between the seat and the door. Trooper Lavoie looked in that direction and saw the handle of a handgun in plain view.[1]

_____

[1] Gomes's testimony regarding the events occurring after the Terry stop differed from the events as described by the troopers. Most significantly, she testified that the gun was not found between the seat and the door, but rather in a plastic bag in the back seat on the passenger side. While the Court credits some of

4

As Trooper Grasso handcuffed Hart, Hart yelled out, "It's all mine, [Gomes] had nothing to do with it." Trooper Grasso escorted Hart to the curb and the troopers secured the firearm, a .40 caliber Baretta loaded with ten rounds of ammunition. After he was read his Miranda rights, Hart admitted that the gun was his and described it in accurate detail.

## II. ANALYSIS

As established by the Supreme Court in Terry v. Ohio, 392 U.S. 1, 30 (1968), "an officer may conduct a brief investigatory stop if he has a reasonable, articulable suspicion that criminal activity is afoot." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004). Hart initially argues that the Terry stop was unreasonable because the basis for the stop was the belief that Hart was a DYS escapee, and such a belief was incredible. The Court agrees that the evidence does not support the stop based on the belief that Hart was one of the DYS escapees.

The evidence, however, demonstrates that the stop was reasonable based on a concern for officer safety. In Terry, the Supreme Court established the objective standard for evaluating whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the

---

Gomes's testimony, it does not credit her testimony regarding the location of the gun. Gomes was not initially forthright with the Court in her relationship with Hart, and the relationship established a bias. The Court finds that the gun was located in plain view between the passenger seat and the door.

belief' that the action taken was appropriate." Id. at 21-22. The inquiry into the reasonableness of the suspicion considers "whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). A stop is justified at its inception if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry, 392 U.S. at 21.

Both parties agree that the stop occurred when Officer Lavoie asked Gomes to put the car in park and turn off her engine. Gomes did not testify regarding any of the events leading up to the stop. While Hart did not fit the description of any of the fugitives sought by the troopers, Trooper Lavoie and Trooper Grasso both observed that Hart was hunched over and held his hand at his waist the entire time he was walking. He appeared nervous and his body movement was unusual. Based on these facts, the officers had an articulable suspicion that Hart carried a concealed weapon. Compare United States v. Wright, 582 F.3d 199, 211-13 (1st Cir. 2009) (holding that it was error to infer that clutching a pocket, standing alone, implies that the

6

pocket contains a weapon, but the totality of the circumstances justified the stop). In securing the area to conduct an investigation into the missing youths, the reasonable suspicion that an individual present at the scene carried a concealed weapon raised a concern for officer safety justifying the initial stop.

After the initial stop, the troopers became aware that Hart was a member of the Montes Park gang. Hart's actions continued to be unusual, he placed his hands on the dash before such a request was made, and he appeared nervous. The totality of the circumstances justified the troopers' action in ordering Hart to leave the car. Upon getting out of the car, Hart's actions drew Trooper Lavoie's attention to an area of the vehicle where he saw the handle of a handgun in plain view. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris v. United States, 390 U.S. 234, 236 (1968). Seizure of the gun did not violate Hart's Fourth Amendment rights.

Finally, Hart argues that under the Second Amendment, the basis for his stop cannot be the suspicion of a concealed weapon. He argues that the Supreme Court in District of Columbia v. Heller, 128 S. Ct. 2783 (2008), held that the Second Amendment "conferred an individual right to keep and bear arms," id. at

7

2799, and suggests this right extends to the possession of concealed handguns outside one's home.  <u>Heller</u> does not hold, nor even suggest, that concealed weapons laws are unconstitutional. <u>Heller</u> held that the Second Amendment right to keep and bear arms is not unlimited.  128 S. Ct. at 2816.  Indeed, <u>Heller</u> notes that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  <u>Id.</u>  Moreover, in <u>McDonald</u> v. <u>Chicago</u>, 130 S. Ct. 3020 (2010), where the Supreme Court held that the Second Amendment applies to the States through the Fourteenth Amendment, the Court explained that "[i]n <u>Heller</u>, we held that the Second Amendment protects the right to possess a handgun **in the home** for the purpose of self-defense." <u>McDonald</u>, 130 S. Ct. at 3050 (emphasis added).  Therefore, it was not a violation of Hart's Second Amendment rights to stop him on the basis of the suspicion of a concealed weapon.

## III. CONCLUSION

Accordingly, the Motion to Suppress [Docket No. 13] was denied.

WILLIAM G. YOUNG
DISTRICT JUDGE